UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER HOWART,

                Plaintiff,                   Case No. 04-73087
                                                Judge Avern Cohn

v.

BYRON AREA SCHOOL DISTRICT,
BYRON AREA SCHOOLS,
BYRON AREA SCHOOL DISTRICT BOARD OF EDUCATION,
DR. MARK MILLER, and SCOTT TURPIN,

                Defendants.

_____/

**ORDER AND MEMORANDUM GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

This is an employment case.  Plaintiff Jennifer Howart (Howart) claims that the

defendants wrongfully terminated her from her position as a school bus driver on May 6,

2004 because she has muscular dystrophy.  The defendants are:

- Byron Area School District (the District);

- Byron Area Schools (Byron Schools)[1];

- Byron Area School District Board of Education (the Board);

- Dr. Mark E. Miller (Miller), Superintendent, Byron Area School District.

- Scott Turpin (Turpin), Director of Transportation, Byron Area School District.

Howart claims her termination (1) violated the Michigan Persons With Disabilities

Civil Rights Act (PWDCRA) M.C.L. § 37.1201 et. seq; (2) was in breach of her

_____

[1]  It is not clear that the District is a different entity than Bryon Schools.

employment contract, or in breach of an implied employment contract; and (3) violated her procedural and substantive due process rights under the 14th Amendment to the Constitution.  Howart requests compensatory and punitive damages, along with costs, interest, and attorney fees.

Before the Court is the defendants' joint motion for summary judgment.  The defendants assert that they legitimately terminated Howart for excessive absenteeism, and in particular for not showing up for work or calling in on the morning of May 3, 2004. Additionally, the defendants argue that even if Howart suffers from muscular dystrophy, she is not "disabled" under the PWDCRA's definition because she is unable to perform the essential functions of her job as a bus driver.  The defendants also argue that they did not breach an express or implied employment contract because Howart was an at-will employee; and because she was an at-will employee, she has no procedural or substantive due process rights in continued employment.  Finally, the defendants assert that the individual defendant's are entitled to qualified immunity.

For the following reasons, the defendants' motion will be granted in part and denied in part.

## II.  BACKGROUND

### A.  Howart's Version of the Facts

Howart began working as a full-time bus driver for Byron Schools in January, 2002.[2]  At all relevant times, Turpin was Howart's direct supervisor.  Howart reported to Miller.

---

[2]  Howart previously worked for Byron Schools as a child care aid and as a substitute bus driver starting in spring, 2000.

2

Howart says that she has always suffered from health problems associated with having a neuromuscular disorder such as frequent ankle sprains, tripping, weakness in her hands, chronic pain in her hips, numbness in her extremities, and muscle pain and achiness. She has undergone a series of surgeries throughout her lifetime to alleviate these symptoms. However, Howart says that it was not until the spring of 2003 that she learned of a family history of muscular dystrophy and decided to be tested. In July, 2003, Howart was diagnosed with Charcot-Marie-Tooth-Disease (CMTD), which is a form of muscular dystrophy.

Howart says that she told Turpin that she had been diagnosed with CMTD in July, 2003. Howart also says that she asked Turpin whether he thought it would be a good idea for her to bring in a doctor's note stating that she could work without restriction in case people questioned her ability to drive. Howart says that Turpin agreed with her suggestion, and she provided him with a note to this effect on July 19, 2003. Howart says that she also disclosed her condition to the defendants in January, 2004 on the District's annual physical form by writing down that she had CMTD and checking "yes" on the box for "muscular disease."

Howart says that she tried to keep her condition private, and besides speaking to Turpin and her disclosure on the physical form, she told only two other bus drivers about the diagnosis. Nonetheless, Howart says that many of her co-workers knew that she had suffered from some health condition because she wore arm and leg braces.[3] , Howart says that in October, 2003 she learned that some of her co-workers were

---

[3] Howart's Attendance History Report shows that on September 23, 2003 she was absent because she had a "doctors appointment for braces."

speculating about her ability to drive, and were also saying that she was on heavy medications.  Howart says that she spoke to Turpin who confirmed that some bus drivers were questioning whether she should be driving.   Howart says that Turpin also told her that she should keep her condition secret because if Miller learned that she had muscular dystrophy he would fire her because he would be worried that parents might react negatively to a bus driver with a neuromuscular disease.

Howart also says that after she told Turpin about her diagnosis he began to harass her by scrutinizing her attendance.  In particular, Howart says she took a few days off of work after she was assaulted by her husband in late February, 2004.[4]  She says that Turpin was aware that she had brought a domestic violence charge against her husband, but he nevertheless sent her a letter on March 8, 2004 stating:

> Due to the amount of time taken off, it is going to be required of you to have a doctors statement verifying any future illnesses.  Failure to do so will result in disciplinary action up to and including discharge.

Howart says that other bus drivers were frequently absent, but only she was sent a letter and required to bring in a doctor's excuse.

On the morning of May 3, 2004 Howart failed to show up to work and did not call Turpin to give him advance notification.  Howart called in at approximately 11:00 a.m. and told Turpin that she was ill and would not be in for her afternoon shift.  Howart stated during her deposition that she was absent because she had a bad reaction to the

---

[4]  Howart's Attendance History Report shows that she was absent on March 2; worked half days on March 3 and 4; and was absent on March 8.  All dates refer to 2004.

prescription drug Neurontin, which she had recently started taking.[5]  Howart says that

she asked her husband to call in before her shift began and that when she discovered

that he failed to do so, she called Turpin herself.

On May 6, 2004, Miller sent Howart a termination letter citing her failure to show

up to work without notification as the reason for her termination.  The letter also states

that Howart had previous unexcused absences, and that Tuprin had had several

verbal discussions with her regarding her absences.  Howart says that all her prior

absences were approved by Turpin, and that besides for sending her the letter on

March 8, 2004, Turpin never spoke with her about her absences.

### B.  The Defendants' Version of the Facts

The defendants say they terminated Howart solely for her frequent absences,

and in particular for failing to call in early enough on the morning of May 3, 2004, to

provide Turpin with adequate time to find a substitute driver.

Turpin says that the official policy of the district is to allow busdrivers only 10 paid

sick absences per year.  Turpin says that Howart's attendance history report reflects

that from November 8, 2002 through April 15, 2004 (roughly a year and a half) she was

absent on 38 days and missed 61 routes.  Turpin says that he had two or three

conversations with Howart regarding her absences and her failure to give advance

notice of absences.[6]  Turpin says that he sent Howart the March 8, 2004 letter requiring

---

[5]   It is unclear whether Howart was taking Neurontin to treat CMTD.  The
defendants suggest that Howart was absent because she was recovering from a suicide
attempt.

[6] It is unclear on what dates these conversations occurred.   Turpin did not
document them in any manner, and Howart denies that they occurred.

her to have a doctor's excuse for future absences because her attendance did not improve after he spoke to her.[7]  Turpin says that he also spoke to two other bus drivers about their attendance problems but did not write either a memo requiring them to bring in a doctor's excuse for future absences because they had only exceeded the 10 day paid sick leave limit on a few occasions and had always called in to tell him that they would not be in to work before their shifts began.

The defendants also deny that Howart ever informed them that she had muscular dystrophy or any disability.  Turpin says that he asked Howart to bring in a doctor's note stating that she could work without restriction because some of the other bus drivers told him that Howart was on excessive medications and they questioned whether she was a safe driver.  The defendants say that Miller heard about these rumors and told Turpin to have Howart bring in a doctor's note saying that she could work without restriction.  Turpin also denies that he knew that Howart wore braces on her arms or legs.

### III.  SUMMARY JUDGMENT

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

---

[7] Howart's Attendance History Record shows that she had been absent for 6 days in 2004 when Turpin sent her the March 8, 2004 letter.

6

U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); Anderson, 477 U.S. at 249-50.  Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52).  The Court "must view the evidence in the light most favorable to the non-moving party."  Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  See Anderson, 477 U.S. at 255.  Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted.  Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## IV.  ANALYSIS

### A.  Howart's Persons With Disability Civil Rights Act Claim

### 1.  The Standard

The PWDCRA prohibits an employer from discharging or otherwise discriminating against an employee because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position.  M.C.L. § 37.1202(1)(b).  To establish a prima facie case of disability discrimination, a plaintiff must show that:

    (1)  s/he is "disabled" as defined by the statute;
    (2)  the disability is unrelated to the plaintiff's ability to perform the duties of a particular job; and
    (3)  the plaintiff has been discriminated against in one of the ways set forth in the statute.

Chiles v. Machine Shop, Inc., 238 Mich. App. 462, 473 (1999).

Additionally, the plaintiff must produce enough evidence to create a rebuttable presumption of discrimination.  Rollert v. Dep't of Civil Service, 228 Mich.App 534, 538 (1998).  If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a nondiscriminatory rationale for the action.  Id.  If the employer meets this burden of production, the plaintiff must then prove by a preponderance of the evidence that the legitimate reason that the defendant offered was a mere pretext.  Id.  A plaintiff can establish that the employer's proffered reasons is pretextual by showing by a preponderance of the evidence one of the following: (1) that the employer's reasons have no basis in fact; (2) that they were not really factors motivating the discharge; or (3) the proffered reasons were insufficient to motivate the

8

discharge.  Ridenour v. Lawson Co., 791 F. 2d 52, 56 (6th Cir. 1986).

## 2. Argument

### a.  Whether Howart is "Disabled" Under the PWDCRA

#### i.

The defendants first argue that Howart's claim of disability discrimination must be dismissed because she is not disabled, as the term is defined by the PWDCRA. M.C.L. § 37.1103(d) defines "disability," in pertinent part, as follows:

> (i) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:

> (A) ... substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

The defendants assert that the fundamental duties of a bus driver are "to bring her young passengers to school safely and on time."  They argue that Howart's absences made her unable to perform these duties because she was so frequently not at work.  Therefore, if Howart's absences were caused by her medical condition she is not disabled within the meaning of the PWDCRA because she was unable to timely and safely transport students to school.

#### ii.

In response, Howart argues that she is disabled as defined by the PWDCRA because she was diagnosed with CMTD and that this condition does not effect her ability to drive a school bus.  Howart points out that both Turpin and Miller stated at their

depositions that they did not have any problem with her driving skills.

### b. Whether the Defendants Knew or Perceived Howart to be Disabled

#### i.

Next, the defendants say that even if the Howart is "disabled" under the PWDCRA, her claim must still be dismissed because her termination was not based on her alleged disability.  First, the defendants say that they did not know and had no reason to perceive that Howart had CMTD because she never told them of her diagnosis.  Turpin denies that Howart ever spoke to him about her condition and says that he never saw her with arm or leg braces.  To the contrary, the defendants say that Howart went to great lengths to conceal her medical condition.  They point out that Howart stated at her deposition that she considered her medical condition a private matter, and only told a few of her co-workers about it.  She also provided the defendants with a doctor's note that she could work without restriction.  Turpin says that he requested the note only to verify that she was not on medications, and the note does not mention her condition.   Next, Howart never asked for accommodations for her disability.[8]   Finally, the defendants argue that Howart did not provide them with notice that she had a form of muscular dystrophy when she wrote that she had "Charcot Marie Tooth Disease" on her physical form because the reader would not associate this with muscular dystrophy.

#### ii.

---

[8] It is undisputed that before her diagnosis, Howart requested to drive one of the school's four automatic buses instead of a stick shift.  Her request was granted on the basis of seniority.

10

In response, Howart asserts that the defendants knew that she had CMTD because she told Turpin about her diagnosis in July of 2003; she disclosed her medical condition on the school physical form; and she wore visible braces.

Howart also says that she was terminated because of her medical condition. Howart points out that Turpin told her to keep her condition a secret, warning her that Miller would fire her if he found out about it. A few months later, Howart was the subject of rumors regarding her health; and Miller expressed his concern over these worries.

### c. The Defendants' Proffered Reason for Terminating Howart

#### i.

The defendants maintain that Howart was legitimately terminated solely because she was had an ongoing problem with frequent absences. Turpin says that he spoke with Howart and other bus drivers who had problems with excessive absenteeism. However, the defendants say that Howart had more absences than any other bus driver, which warranted the warning letter and requirement that she bring in a doctor's excuse for future absences. They also say that Howart was the only bus driver who failed to call or show up for a shift after being warned about future absences.

The defendants also say that Howart never notified them that any of her absences were related to her condition, therefore her termination for absences cannot show that they acted with discriminatory intent.

#### ii.

In response, Howart argues that the defendants' proffered reason for terminating her is pretextual because her absences were not really a motivating factor in her

11

discharge and were also insufficient to justify discharging her because other bus drivers with excessive absences were not terminated.  First Howart denies that Turpin ever spoke to her about her absences, and that prior to May 3, 2004 Turpin had approved all her absences.  Next, Howart denies that she had more absences than other bus drivers and points out that during his deposition Turpin stated that other bus drivers had missed routes with little or even no notice[9] and were not required to bring in a doctor's notes for future absences or terminated.

### 3. Resolution

The defendants' motion for summary judgment as to this Howart's PWDCRA claim must be denied for the following reasons.

### a.

Howart has made out a prima facie case of disability discrimination.  First, she is disabled as defined by the PWDCRA.  She was diagnosed with CMTD, a neuromuscular disorder associated with muscular dystrophy.  Second, Howart's job was to drive a school bus, and it is undisputed that CMTD did not effect her ability to drive a school bus. Third, Howart was terminated from her position, which is a prohibited act under the  PWDCRA if premised upon her medical condition.

Regarding the third element, a factual dispute exists as to whether the defendants knew that Howart had CMTD.  Turpin asserts that Howart never told him that she had CMTD and that he only asked her to bring in a doctor's note in response to

---

[9]  Specifically, bus drivers Bonnie Lynch, Dawn Tombley, Randy Hill, and Holly Graham all gave less than 15 minutes notice that they would not be showing up for a shift.  Bus Driver Deena Sanshone missed a shift without notifying the defendants.

rumors that she was on medications that affected her driving.  This incident appears to
have occurred in October 2003.  However, the doctor's note on record is dated July 19,
2003, which supports Howart's testimony that she brought in the note shortly after she
told Turpin of her diagnosis.  Next, the record shows that Howart wrote on her physical
form that she had CMTD in the section that requires employees to disclose whether
they have a muscular disease and checked the box marked "muscular disease."  The
defendants' argument that the reader would not have known what  CMDT was is
meritless, considering that most likely a medical professional would be reading the form.

        Howart has also established that there is a genuine issue of fact concerning
whether her termination was related to the defendants' alleged knowledge of her
condition.  First Howart stated that Turpin warned her not to let Miller know about her
condition or else he would terminate her.  Howart was subsequently the subject of
workplace rumors concerning her health and her ability to drive.  Miller says that he was
aware of and concerned about these rumors.

**b.**

        Howart 's PWDCRA claim must also proceed because she has rebutted the
defendants' proffered reason for terminating her.  She has raised a genuine issue as to
whether she was treated differently than other bus drivers who were also frequently
absent or who had failed to notify the defendants in a timely manner that they would be
absent.  Despite Turpin's testimony that he spoke to two other employees about their
absences, only Howart was sent a letter requiring her to provide a doctor's excuse for
future absences.  While the Court notes that the defendants could have sent the letter

13

for legitimate reasons,[10] Howart has nonetheless created an issue as to whether her medical condition was a substantial factor in the defendants' decision to terminate her. To resolve the disputed versions of the events, the Court would be required to determine which of the parties is more credible. Such an exercise is prohibited at the summary judgment stage, as only the trier of fact may determine credibility, weigh evidence, and draw inferences. See Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255 (1986).

### B. Breach of Employment Contract

#### 1. The Legal Framework

In Michigan, all employment is presumed to be "at will," that is, terminable at the will of the employee or the employer. Lynas v. Maxwell Farms, 279 Mich. 684 (1937). However, it is well recognized that employers may enter into contractual relationships with their employees which limit the employer's ability to fire an employee without a valid reason to do so. Courts have recognized the following three ways by which a plaintiff can prove such contractual terms:

> (1) proof of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause;
> (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or
> (3) a contractual provision, implied at law, where an employer's policies and procedures instill a "legitimate expectation" of job security in the employee.

_____

[10] Turpin sent the March 8, 2004 letter approximately 8 months after Howart alleges that she told him about her medical condition. This gap in time suggests that Turpin was not motivated to send the letter by his alleged knowledge of Howart's condition. Moreover, the letter was sent shortly after Howart missed several days of work after being assaulted by her husband –an event unrelated to her medical condition.

14

Lytle v. Malady, 458 Mich. 153, 164 (1998) (internal quotes and footnotes omitted).

Howart contends that a document called the "Byron Area Schools Transportation Department Contract provided for Bus Drivers" (the Bus Driver Contract) is an employment contract between her and the defendants. While it is undisputed that the Bus Driver Contract does not contain an explicit "just cause" provision, Howart argues that the terms of the Bus Driver Contract in conjunction with oral promises made by Turpin create either an express agreement or an implied contractual provision that she could be terminated only for just cause after the defendants engaged in a multi-step disciplinary procedure.

### a.  The Standard For Express Agreements

Michigan courts require express agreements concerning job security based on mutual assent to "be clear and unequivocal to overcome the presumption of employment at will." Rood v. General Dynamics Corp., 444 Mich. 107, 119 (1993) (quoting Rowe v. Montgomery Ward & Co., Inc., 437 Mich. 627, 645 (1991)). Such a determination requires an examination of pre-employment negotiations and conduct under an objective test analyzing "all the relevant circumstances surrounding the transaction" to ascertain the nature and scope of traditional contract elements including offer, acceptance and consideration. See Rowe, 437 Mich. at 641-44; Bullock v. Automobile Club of Mich., 432 Mich. 472, 481-84(1989).

### b. The Standard for Implied Agreements

The implied contract theory was described in Toussaint v. Blue Cross & Blue Shield of Mich., 408 Mich. 579, 613 (1980), as follows:

15

[W]here an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does is matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation."

This now well-established "handbook exception" to the employment-at-will doctrine, see In re Certified Question (Bankey v. Storer Broad. Co.), 432 Mich. 438, 454-455 (1989), recognizes that employees may hold employers to enforcement of policy terms relating to job security as long as the policy remains in effect.

Michigan courts have developed a two-step approach for evaluating legitimate expectation claims: "The first step is to decide what, if anything, the employer has promised, and the second requires a determination of whether that promise is reasonably capable of instilling a legitimate expectation of just-cause employment." Lytle, 458 Mich. at 164-65 (internal quotes omitted).  In Rood, the court expounded the first-step inquiry beginning with the definition of "promise" taken from Restatement of Contracts (Second) § 2(1), which is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." See Rood, 444 Mich. at 138-39, . The court then explained:

As is readily apparent, not all policy statements will rise to the level of a promise. For instance, an employer's policy to act or refrain from acting in a

16

specified way if the employer chooses is not a promise at all. Also apparent in the definition of a promise is the need for specificity. The more indefinite the terms, the less likely it is that a promise has been made. And, if no promise is made, there is nothing to enforce.

## 2.  Argument

### a.

Howart says that the Bus Driver Contract is a binding employment contract because the bus drivers and the defendants intended for it to bind the parties.  In particular, Howart points out that bus driver Bonnie Jarvinen and defendant Miller both stated that the bus drivers intended the defendants to be bound to the contract. Moreover, Miller stated at deposition that in an effort to make the Bus Driver Contract more official, says the District agreed to replace the word  "handbook" with "contract" within the document.

Howart says that although the alleged contract does not explicitly state that an employee can only be discharged for just cause, that provision can be read into the Bus Driver Contract because of the existence of a clause that states that the Board,

> will maintain a reasonable and consistent standard of job performance, objectively reflecting these standards in decisions which affect your promotion, compensation and retention.

Howart says that this clause means that the defendants will take an objective approach when dealing with the termination of employees.

Howart argues that the contractual language must be viewed in conjunction with oral promises made by Turpin to the bus drivers that the District follows a progressive disciplinary policy in which an employee must receive a verbal warning, a written warning, and a suspension, before being terminated.  In particular, Howart says that two

other bus drivers, Bonnie Lynch (Lynch) and Sandy McClure (McCLure) say that they believe a multi-step disciplinary policy was used; and Miller told the Equal Employment Opportunity Commission (EEOC) that the District's disciplinary process is progressive.

**b.**

The defendants respond that the Bus Driver Contract is merely a handbook, and not an employment contract. The defendants also say that the Bus Driver Contract does not address discipline at all, and instead states that:

> The purpose of the Employee Contract is to provide a general outline of compensation and benefits for individuals employed in the Transportation Department as bus drivers. Other aspects of the employment relationship not addressed by this contract remain within the jurisdiction of he school district.

Therefore, the defendants argue, even if the Bus Driver Contract is a contract, whether and how to discipline and terminate employees was left to the discretion of the defendants. The defendants point out that Turpin testified that he consults with Miller when he feels that discipline is necessary in a particular situation, and they decide together what steps to take.

Next, the defendants say that the clause that Howart relies on is too vague to overcome the "at-will" presumption. They compare this case to Schippers v. SPX Corp., 444 Mich 107, 141 (1993), in which the Supreme Court of Michigan held that a handbook which included a clause stating that the employer would be "fair" to employees was far too vague to enforce as an "at- will" policy. The defendants argue that the bus drivers who have been deposed have not been able to articulate the existence of a uniform discharge policy. For instance, defendants say that bus driver Julie Howe (Howe) testified that she believes that the disciplinary policy is discretionary and bus driver

18

Bonnie Lynch (Lynch) testified that she had never been informed of what the disciplinary procedure entails.

Alternatively, the defendants state that even if the Court finds that the Bus Driver Contract is binding on the parties, it states that:

> The district may require a physician's statement verifying illness. Abuse of the sick leave is proper grounds for disciplinary action up to and including discharge.

Therefore, defendants say that they were acting in accordance with the Bus Driver Contract when they required Howart, who was excessively absent, to verify the need for future absences, and terminating her when she failed to show up to work without a doctor's excuse.

### 3. Resolution

The defendants' motion for summary judgment will be granted as to Howart's breach of contract claim. There is no express or implied contract establishing a graduated disciplinary process. While Howart provides evidence that the Bus Driver Contract was intended to be binding, the document does not cover disciplinary procedures. Instead, the Bus Driver contract leaves matters not specifically addressed in document at the Board's discretion. Also, Howart has presented no evidence that the bus drivers negotiated for a graduated disciplinary process in the Bus Driver Contract. The provision stating that the Board "will maintain a reasonable and consistent standard of job performance, objectively reflecting these standards in decisions which affect your promotion, compensation and retention" is simply too vague to establish a set disciplinary procedure. Moreover, Howart's position is further undermined by the fact that while general disciplinary procedures are not addressed, the Bus Driver Contract

19

specifically provides that the District may require medical verification for sick leave, and may take disciplinary action against an employee for not providing verification.

Likewise, there is no evidence that Turpin's alleged statements regarding a graduated disciplinary procedure was the result of negotiation between the defendants and the bus drivers. Turpin's alleged statements are not clear and unequivocal. Neither are they clear enough to amount to a promise forming an implied contract. Several bus drivers were deposed, and those who recalled Turpin saying that there was some sort of graduated disciplinary procedure could not consistently articulate what they believed the procedure entailed. For instance, Howart relies on the testimony of Lynch. However when Lynch was asked if she had any knowledge about whether there is a disciplinary process in place, she stated, "I'm sure there is, but I personally don't know what it is –the process is." Later when asked what the disciplinary procedure is, Lynch stated that "[Turpin] didn't tell me of a procedure. He just said there is a procedure that's followed."

The testimony of another bus driver, Howe, similarly shows that the bus drivers did not believe there was a uniform and definite disciplinary procedure that was consistently followed. Howe described the defendant's disciplinary policy as "discretionary." She said that "[t]here is [a disciplinary policy], and its not very strict ... If you do something wrong you either get wrote up for it or talked to about it or talked to about it and then wrote up and thats the extent of it." She also testified that she personally had been given two written warnings without having a verbal warning first.

### C. Procedural Due Process

20

### 1.  The Standard

The Due Process clause of the Fourteenth Amendment provides that "no State shall … deprive any person of life, liberty, or property, without due process of law …" U.S. CONST. amend. XIV.  When considering claims of the violation of due process rights, a court should undertake a two-step analysis.  The first step is to determine whether the plaintiff has a liberty or property interest entitled to due process protection. Bd. of Curators of Univ. of Missouri v. Harorwitz, 435 U.S. 78, 82 (1978).

Howart claims that she has a property interest in continued public employment. A property right in continued public employment comes from a contract or statute. Manning v. City of Hazel Park, 202 Mich. App 685, 694 (1993).

Where a plaintiff is entitled to procedural due process, the second step is to determine what process is due.  Due process means that the plaintiff has been given sufficient notice and the opportunity to be heard "at a meaningful time and in a meaningful manner."  Matthews v. Eldridge, 424 U.S. 319, 333 (1976).

### 2.  Argument

#### a.

Howart says she is a civil public servant in the State of Michigan and has a legitimate claim of entitlement to her continued employment.  Howart repeats her arguments that there was either an express or implied contract that she could be terminated only for just cause and after a disciplinary procedure had been employed. Howart argues that a public employee's legitimate expectation of continued employment (from a contract) can give rise to a vested property interest.  Toussaint, 408 Mich. 579

21

(1980); Bracco v. Michigan Technological University, 231 Mich. App. 578, 587-88 (1998).

Howart says that her procedural due process rights were violated because the defendants did not employ a graduated disciplinary procedure, and instead terminated her without warning.  Howart says she was not provided with an opportunity to refute the allegations against her or to respond to her termination in any sort of hearing.  Likewise she could not appeal her termination.

**b.**

The defendants respond that Howart is an at-will employee, and it is well settled that a public employee does not have a property interest in continued employment where the position is held at-will.  Bishop v. Wood, 426 U.S. 341 (1976); Manning v. City of Hazel Park, 202 Mich. App. 685 (1993).  Where there is no cognizable property interest, a public employer need not comply with the requirements of procedural due process.  Id. at 695.

**3.  Resolution**

An employee does not have a property interest in continued employment when the position is held at the will of the employee's superiors and the employee has not been promised termination only for just cause.  Bishop v. Wood, 426 U.S. 341 (1976) As discussed above, Howart has failed to she could be terminated only for "just cause." Therefore, Howart is an at-will employee, and is not entitled to due process procedures.

**D. Substantive Due Process**

22

### 1. The Standard

The Court of Appeals for the Sixth Circuit recognizes that the 14th Amendment has a substantive due process component that "protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." Gutzwiller v. Fenik, 860 F.2d 1317, 1328 (6th Cir.1988).  There are two types of substantive due process violations: (1) official acts that are unreasonable, arbitrary, and cause a deprivation of a substantive right specified in the constitution or (2) official acts that may not take place no matter what procedural protections accompany them because they "shock the conscience." Wilkerson v. Johnson, 699 F.2d 325, 328 (6th Cir. 1983).

### 2.  Argument

#### a.

Howart says that the termination violated her substantive rights to:

• her property interest in continued employment;

• her property interest in her financial benefits and wages;

• her liberty interest in her good name, reputation, integrity, honor;

• her opportunity to take advantage of future employment opportunities

Howart says that the defendants have misconstrued her substantive due process claim as being one for breach of an employment contract.  She says that her claim really encompasses an equal protection claim.  Howart says that the holding in Hornfield v. City of North Miami Beach, 29 F. Supp. 2d 1357 (S.D. FL, 1998),  extends an equal protection analysis to claims under statutes such as the PWDCRA, and that her equal

23

protection rights were violated because she was treated differently than other bus drivers who were not disciplined for being frequently absent.  Thus, the defendant's decision to terminate her was arbitrary and capricious, and premised only on her alleged disability.

**b.**

The defendants respond that substantive due process does not protect at-will or even just cause employees.  Sutton v. Cleveland Bd. of Ed., 958 F.2d 1338 (6th Cir. 1992) (while "just cause" employee may have procedural due process rights in continued employment, substantive due process does not provide similar protection); Collins v. Harker Heights, 503 U.S. 115, 125 (1992); Braken v. Collica, 94 Fed. Apx. 265, 269 (6th Cir. 2004) ("at-will employment is hardly the sort of fundamental right that substantive due process is designed to protect").

The defendants also argue that Howart should not be able to bring an equal protection claim in the guise of a substantive due process claim.  The defendants say that Howart has been given the opportunity to amend her complaint three times.  She could have added an equal protection claim and chose not to, and should not be allowed to do so now.

**3.  Resolution**

 Howart's "substantive due process claim" is really an equal protection claim, and should have been brought as a separate claim.  Contrary to Howart's argument, Hornfield does not address whether substantive due process encompasses equal protection such that a plaintiff may assert a violation of equal protection under a claim that her substantive due process rights were violated.  Hornfield addresses whether a

24

plaintiff may bring a discrimination claim under the ADEA and also under the equal

protection clause.  In Hornfield the plaintiff brought an equal protection claim in her

original complaint, and did not bring a substantive due process claim.  It was never an

issue whether substantive due process encompasses the equal protection clause.

Here, Howart was allowed to amend her complaint no less than three times.

Howart failed to bring a claim that her equal protection rights were violated in her first,

second, or third amended complaint.  The Court will not address the issue now.[11]

## V.  CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is

DENIED as to Howart's PWDCRA claim, and is GRANTED as to Howart's remaining

claims.

SO ORDERED.


                                         s/Avern Cohn
                                        AVERN COHN
                                        UNITED STATES DISTRICT JUDGE


Dated:  April 19, 2007


I hereby certify that a copy of the foregoing document was mailed to the parties of record
on this date, April 19, 2007, by electronic and/or ordinary mail.

                                         s/V. Sims for Julie Owens
                                        Case Manager, (313) 234-5160

---

[11]  Because the Court finds that the defendants did not violate Howart's
constitutional rights, the issue of whether the Turpin and Miller are entitled to qualified
immunity does not need to be addressed.

25